UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JOHN SMITH,
    Plaintiff,

v.                       05-CV-3229

TERRY POLK,
KEVIN WINTERS,
SANDRA FUNK,
DEBORAH FUQUA,
STANLEY SIMS, M.D., and
LOWELL BROWN, M.D.,

    Defendants.

### Order Granting Summary Judgment

    Before the Court is the motion for summary judgment by defendant Drs. Brown and Sims (d/e 32), to which the plaintiff has not responded. The motion for summary judgment negates any reasonable inference of deliberate indifference to the plaintiff's serious medical needs, the only claim before the court. Accordingly, the motion is granted and this case is terminated.

### Summary Judgment Standard

    A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);Fed. R. Civ. P.56©; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994).

    In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). However, "[s]ummary judgement is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgement must be granted." *Jones v. Johnson*, 26 F.3d

727, 728 (7th Cir. 1994).

### Allegations in Complaint

The plaintiff filed his Complaint in August, 2005, while he was incarcerated in Western Illinois Correctional Center. He was transferred to Big Muddy Correctional Center in December 2005, but did not seek to add any claims relating to his medical treatment at Big Muddy. Thus, this case involves only the medical treatment the plaintiff received (or did not receive) at Western Correctional Center from March 2002 through December 2005.

The plaintiff alleges in his Complaint that he has pain, swelling and what he believes is an infection in his face around or behind his eye. He alleges that the swelling was increasing and that he could no longer see out of his eye--the pain so bad he almost blacks out at times and has seizures. He attaches a report from 2003, which states in part "appearance certainly strongly suggestive of a mass in the right frontal sinus." The report recommends an MRI.

### Undisputed Facts[1]

1. Plaintiff, John Smith, was an inmate at the Western Illinois Correctional Center from March 8, 2002 through December 28, 2005. (Plaintiff's deposition, attached hereto as Exhibit 5, pp. 4-5; see also Exhibit 3A.)

2. Plaintiff's lawsuit against Drs. Sims and Brown concerns Plaintiff's belief that he has an infection in his eye. (Exhibit 5, p. 6.)

3. Plaintiff suffered trauma to the back of his head from a car accident in 1984. (Exhibit 5, p. 6.)

4. This motor vehicle accident led to the development of seizures. (Exhibit 5, p. 7.)

5. This patient had surgery on his eye in 1997 while an inmate at the Menard Correctional Center.

---

[1] These undisputed facts are copied essentially verbatim from the memorandum in support of summary judgment filed by Drs. Sims and Brown (d/e 32). The cites are also copied and refer to the attachments to that memorandum. These facts are accepted as true because they are supported by cites to the record, and because the plaintiff failed to respond, though warned that the defendants' statement of facts would be accepted as true if the plaintiff failed to submit evidence to contradict those statements. The plaintiff was also warned that a motion is deemed uncontested if no opposing brief is filed. Rule 56 Notice, d/e 34; 9/26/06 text entry (warning the plaintiff that he had not established a justiciable question on deliberate indifference to a serious medical need and that Drs. motion would moot other pending motions); *see also Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003), *quoting Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000)( . . . "[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission. . . ." (citation omitted)).

(Exhibit 5, pp. 7-8.)

6. Mr. Smith believes that his right eye could be improved with surgery based upon his own interpretation of a CT scan taken by Raymond K. Lee in March of 2003. (Exhibit 5, p. 11.)

7. Mr. Smith believes the term "post-surgical" suggests repairable with surgery. (Exhibit 5, p. 10.)

8. Mr. Smith is not suffering from an infection in his eye. (See Affidavit of Lowell Brown, M.D., attached hereto as Exhibit 2.)

9. Blood work drawn to check the level of medication taken to control his seizures also suggests that Plaintiff's white blood cell count is within normal limits. (Exhibit 4T.)

10. In general, lab reports would show elevated white blood cell counts if an ongoing infection were present. All of the labs noted in Exhibit 4T reference normal levels and no evidence of infection. (Exhibit 2; Exhibit 4T.)

11. Dr. Sims was the Medical Director at the Western Illinois Correctional Center when Mr. Smith was transferred there in March of 2002 through August of 2003. (See Affidavit of Dr. Sims, attached hereto as Exhibit 1.)

12. In the course of Dr. Sims' employment as the Medical Director at the Western Illinois Correctional Center, he provided care and treatment to Mr. John Smith. (Exhibit 1.)

13. Attached to Dr. Sims' Affidavit are the relevant medical records relied upon and generated during the time at issue while the Medical Director. He also relied upon these records when making his Affidavit. These records were generated and kept in the ordinary course of business. (Exhibit 3.)

14. Plaintiff was transferred to the Western Illinois Correctional Center on March 8, 2002. (Exhibit 3A.)

15. This inmate's main medical concern throughout the time of his incarceration related to his history of having seizures. (Exhibit 3.)

16. From March 8, 2002 through the date that Dr. Sims left Western Illinois Correctional Center, Mr. Smith was seen on numerous occasions relating to complaints regarding his seizures and his medication for his seizures. Mr. Smith was provided extensive treatment in the form of not only medication, but placed in the infirmary on 23-hour observation on several occasions. Mr. Smith was seen not only by Dr. Sims personally for this issue, but also by various nurses and other staff members. (Exhibit 3.)

17. In fact, Mr. Smith was seen on the following dates for seizure-related complaints and treatment:

  March 24, 2002 on six (6) separate occasions;
  March 25, 2002 by nurses and by Dr. Sims personally;
  April 1, 2002 for follow-up post-seizure by me;
  April 11, 2002 for seizure clinic;
  April 15, 2002 for check of Dilantin levels (seizure medication);
  April 16, 2002 Dilantin Tegretol tests;
  May 8, 2002;
  May 15, 2002 (Exhibit 3).

18. Mr. Smith's records include charting from Dr. Sims and nurses relating to Dilantin levels on the following dates:

  April 17, 2002;
  April 24, 2002;
  April 25, 2002;
  April 29, 2002; and
  April 30, 2002 (Exhibit 3).

19. Plaintiff was seen on May 7, 2002 and placed in the infirmary on 23-hour observation for potential seizure symptoms which were reported by the Plaintiff's cell mate. (Exhibit 3.)

20. Mr. Smith was seen for complaints relating to burns on his left forearm on July 1, 2002 and complaints of injuring his right shoulder on July 2, 2002. (Exhibit 3.)

21. Plaintiff had blood drawn for seizure medication checks on August 14, 2002. Seizure clinic took place on August 22, 2002. Mr. Smith was seen for complaints of hemorrhoids on August 30, 2002. (Exhibit 3.)

22. For all the reports of seizures on September 2, 2002, Mr. Smith was placed in the infirmary secondary to seizure episodes and seen by Dr. Sims on September 3, 2002. (Exhibit 3.)

23. A flu vaccine was given on December 3, 2002. (Exhibit 3.)

24. Blood work was drawn for lab level checks for Dilantin/Tegretol on December 12, 2002. Labs were evaluated on December 17, 2002. Labs were drawn again on December 18, 2002. (Exhibit 3.)

25. The next seizure clinic took place on December 23, 2002. (Exhibit 3.)

26. On December 23, 2002, Mr. Smith was seen on the seizure clinic. On that occasion, Dr. Sims noted that the patient was due for an examination with respect to his vision. Dr. Sims therefore made an eye referral to the optometrist. The patient has no specific complaints on this date, nor on any date from March 2002 until that date concerning any complaint of pain in the patient's eye due to an alleged infection. ( Exhibit 3 in its entirety and 3B specifically referencing Dr. Sims'

visit of 12/23/02, which reads as follows:

> M.D. Note: Patient presents complaining of last grand mal seizure being July of 2002. Gen (generally) come alert oriented times 3 HEENT- dentition poor (plus gingivitis). Hyperplasia. Resp. lungs clear. CV - (cardiovascular) S1 S2 (regular rhythm) GI (gastrointestinal) benign. Neuro-C2, C12 grossly intact. Assessment: Patient with good central therapeutic levels while on Tegretol Dilantin.
>
> Plan: (1) dental referral secondary to bleeding gingiva hyperplasia; (2) Dilantin Tegretol level 4 months; (3) CBC LFTs 4 months (comprehensive blood count; (4) eye referral; (5) EEG done Stateville 1992; (6) Patient educated regarding symptoms and treatment of epilepsy and oral hygiene. (Exhibit 3B).

27. The patient was seen by the optometrist on March 4, 2003 and was noted to have some chronic swelling and sinusitis. (Exhibit 3C.)

28. On March 17, 2003, Mr. Smith was sent to the Passavant Area Hospital in Jacksonville for a CT scan of his head and paranasal sinuses. (Exhibit 3C.)

29. The report signed by Dr. Raymond K. Lee of March 17, 2003 concerning the CT scan found an area of encephalomalacia in the right frontal lobe. (Exhibit 3D.)

30. This condition refers to an area of soft brain matter and was most likely the result of the patient's severe head trauma resulting from a prior motor vehicle accident. (Exhibit 1.)

31. A CT scan of the paranasal sinuses was also performed on March 17, 2003. (Exhibits 3E and 3F.) The findings noted also by Dr. Raymond K. Lee found in Exhibits 3E and 3F reflect a bony defect in the superior aspect of the right orbit with an expanded soft tissue filled right frontal sinus. The CT scan further suggests that the changes noted could be post-surgical or suggestive of a mass in the right frontal sinus. (Exhibits 3E and 3F.)

32. "Post-surgical" refers to the development of a condition following sinus ethmoid surgery this patient had received on July 5, 1997. (Exhibit 1.)

32. The patient was seen for seizure-related complaints on March 20, 2003; March 21, 2003; and March 22, 2003. (Exhibit 3.)

34. It should be noted that on March 22, 2003, the patient reported that he had a headache over his left eye, but related this to having bumped his head when he had had a seizure. The nurses note reads:

> 3/22/03 - Nurse note 8 a.m. Up in room, states has a headache over left eye, meds taken, states thinks he bumped head when he had the seizure. (Exhibit 3G.)

5

35.  Mr. Smith was seen for seizure observation in infirmary from March 20, 2003 through March 26, 2003. (Exhibit 3.)

36. On March 25, 2003, Dr. Sims made a note as follows:

> M.D. Note 9:12 a.m. - Patient presents for follow-up of seizure disorder. Patient alert, oriented times 3. Assessment: (1) grand mal seizure disorder; (2) abnormal CT scan. Plan: Obtain old CT scan report and fax to Dr. Owens to obtain prior records Volumes 1 through 3.  Follow-up to the findings on the CT scan, I obtained the patient's prior reports and
> faxed them to a colleague for further discussion and review. Per my discussions with Dr. Owens, we determined that in comparing the prior CT scan reports with the new one, the patient's condition appeared to be stable and that he would not benefit from an MRI as the course of care would not be modified by the results. (Exhibit 3G.)

37. In Dr. Sims' opinion, the results of the CT scan reflected a bony defect and not a mass as comparing this report to prior radiological reports suggested a stable condition over the course of several years. (Exhibit 1.)

38. In Dr. Sims' opinion, an MRI examination of the sinuses was not medically necessary as the results from that MRI would not affect the care and treatment provided to the inmate, but may simply have defined the area more definitively as to which tissues were soft tissues and which were bony. Clinical correlation did not suggest a MRI would be beneficial in providing care to this patient.  (Exhibit 1.)

39. Based on Dr. Sims' discussions with Dr. Owens, no further treatment was warranted for a bony deformity that was cosmetic in nature. (Exhibit 1.)

40. Mr. Smith was released from the healthcare unit infirmary on March 26, 2003. (Exhibit 3H.)

41. The patient was seen again on April 3, 2003 for seizure complaints, as well as April 23, 2003. (Exhibit 3.)

42. The patient was seen for mandatory vaccinations on July 10, 2003 and for blood level checks on August 6, 2003. (Exhibit 3.)

43. The patient was seen in a seizure clinic on August 11, 2003. The patient advised the nurse that he told his cell mate not to report any seizure activities. He denies seizure activity for the month. On that occasion, the nurse noted Mr. Smith had questions about the CT of his head which was done in March of 2003. (Exhibit 3H.)

44. On August 13, 2003, the nurse practitioner made a note concerning the plaintiff's questions concerning the CT scan results and possible follow-up with Dr. Sims. The nurse practitioner

accurately noted that the CT scan had been compared with an old one and no change was found. This was reviewed by Dr. Sims' colleague, Dr. Owens, and they found no follow-up was needed as the patient's stable condition clinically verified that his symptoms were benign. A nurse
practitioner sick call was scheduled to advise the patient of these results. (Exhibit 3I.)

45. On August 14, 2003, the nurse practitioner discussed the aforementioned results with Mr. Sims. (Exhibit 3J.)

46. Dr. Sims saw Mr. Smith again on August 18, 2003. At that time, the patient requested copies of the March 2003 CT scan reports. Mr. Smith voiced no other complaints. Dr. Sims xeroxed copies of Mr. Smith's old records and gave those to him from his file. (Exhibit 3K.)

47. Exhibit 3F does make reference to the term "post-surgical." This terms means after surgery and does not mean that a condition can be corrected with surgery. (Exhibit 1.)

48. Based upon the review of the records obtained from the Department of Corrections concerning care and treatment provided to Mr. Smith, Dr. Sims does not believe he saw Mr. Smith again after August 18, 2003 in the capacity as his physician or any other capacity. (Exhibit 1.)

49. In Dr. Sims' opinion, the main medical issue being addressed for this patient during the time that he was the Medical Director appears to have been an ongoing seizure problem which was being evaluated and treated regularly. (Exhibit 1.)

50. On occasion, Mr. Smith made complaints or inquiries regarding flare-ups of sinusitis and a drooping eye. As noted herein, a CT scan was obtained, evaluated, and discussed with other physicians to determine whether Mr. Smith had an underlying medical condition which was causing his problems and the treatment issues to possibly address those problems. (Exhibit 3.)

51. In the course of Dr. Sims' care, it was found that there was no underlying significant medical problem causing the patient's symptoms. Mr. Smith suffers from a bony defect as noted on the CT scan referenced as Exhibit 3E related to an old trauma. (Exhibit 3.)

52. In Dr. Sims' opinion, Mr. Smith was provided with all of the treatment that was medically necessary to address his medical needs. (Exhibit 1.)

53. As these medical records reflect, Mr. Smith was seen on numerous occasions for his complaints, which were all noted, evaluated, and treated. (Exhibit 3.)

54. Dr. Brown is currently the Medical Director at the Western Illinois Correctional Center. He has served in that capacity since January of 2004. (Exhibit 2.)

55. In the course of his employment as the Medical Director at the Western Illinois Correctional

Center, Dr. Brown provided care and treatment to Mr. John Smith. (Exhibit 2.)

56. Attached to Dr. Brown's Affidavit are the relevant medical records relied upon and generated during the time at issue while the Medical Director. He also relied upon these records when making this Affidavit. These records were generated and kept in the ordinary course of business. (Exhibit 4.)

57. Mr. Smith was transferred from the Western Illinois Correctional Center to the Big Muddy Correctional Center on December 28, 2005. (Exhibit 4A.)

58. The first time Dr. Brown saw Mr. Smith personally was April 16, 2004 in the seizure clinic. On that occasion, he noted the patient's vital signs. Mr. Smith's lungs were clear. He had no murmurs. Dr. Brown noted the patient had ptosis of the right eyelid (a drooping eyelid). Dr. Brown noted the patient's medication levels for Tegretol and Dilantin. He evaluated the patient's CBC (comprehensive blood count) as being normal. Labs were normal as well. The treatment plan for Mr. Smith was to continue him on his same medication. Dr. Brown also made notations regarding his prior seizure activity, as well as his oral hygiene. (Exhibits 4B and 4C.)

59. Prior to that visit, Mr. Smith had reported to the nurse the following information:

> S: Offender presents for increased Dilantin. Complains of increased tiredness. Reports cellie stated he had a seizure after returning from having blood drawn on 4/13/04. Also states had seizure this a.m. Did not report seizures. Has edema periorbital right. O: NAD, well-appearing. Alert and oriented times 3. Gait steady. No nystagmus. Neuro check grossly intact. A: (1) Increase Dilantin levels; (2) history of encephalomalacia right frontal lobe. Bony defect superior aspect right orbit.
>
> P: (1) Refuses offer to be placed in infirmary; (2) hold Dilantin tonight and tomorrow, resume Dilantin 4/17/04; (3) Dilantin and Tegretol levels in 2 weeks; (4) schedule appointment with Dr. Brown concerning right eye; (5) present to healthcare unit for any seizure activity. (Exhibit 4.)

60. In conjunction with this nurse's note, the patient was scheduled to be seen by Dr. Brown regarding the patient's right eye. (Exhibit 4D.)

61. Dr. Brown again saw the patient on April 23, 2004 with respect to the patient's complaints of the droopy eye, medically referred to as ptosis. (Exhibit 4E.) His notes from that visit are as follows:

> Weight: 172, Blood pressure 138/82; temperature 96.7; pulse 80; respiratory 16. S: ptosis (right) due to complications of sinus surgery. CT showed encephalomalacia (trauma 1984) and sclerosis of orbit superiorly.
>
> O/A: Injury to innervation of right upper lid.

      P: Will discuss with Dr. Owens. (Exhibit 4E.)

62. On April 23, 2004, Dr. Brown saw Mr. Smith for his complaints regarding his drooping right eye or ptosis. It was noted at that time that the patient complained that he believed this was due to a sinus surgery. Dr. Brown noted that the CT scan showed encephalomalacia (a softening of the brain injury) due to a trauma in 1984 and sclerosis of the orbit of his eye superiorly. On that date, Dr. Brown's assessment was that the patient had suffered an injury to the nerves of right upper lid. This nerve injury prevented the patient from lifting his right eye. The plan was to discuss the situation with Dr. Owens, a consulting physician with Wexford. (Exhibit 4.)

63. On April 26, 2004, Dr. Brown discussed the case with Dr. Owens. As a result of those discussions, they found that there would be no recoverable function of the eyelid regardless of the type of treatment provided to the patient. It was their assessment at that time that due to the injury, nerve function could not be restored to the patient and they therefore felt that the condition was permanent. Any surgical plan to repair the eye would either be to leave it permanent open, which was not a medical option. The patient's eye could also be permanently closed; however, this left no opportunity for the patient to retain any vision in that eye. (Exhibit 4.)

64. Dr. Brown and Dr. Owens therefore decided that the patient's condition was best left as is. (Exhibit 4E.)

65. This patient was seen at various times for monitoring of his Dilantin and Tegretol levels, medications provided to control the patient's seizures. (Exhibit 4.)

66. Mr. Smith was seen by the nurse practitioner on August 12, 2004, who noted the patient denied any complaints. (Exhibit 4F.)

67. Subsequently, Dr. Brown saw Mr. Smith on August 13, 2004 in the seizure clinic. (Exhibits 4G and 4H.)

68. The patient was monitored and treated with respect to seizures in September of 2004. (Exhibit 4.)

69. The patient was then seen by the nurse practitioner in the seizure clinic on December 20, 2004. (Exhibit 4I.) On that date, the patient's right eye was noted to be one-fourth open and puffy. No nystagmus or ataxia. The patient was scheduled for a visit with the optometrist to screen for glaucoma due to the Tegretol and the abnormality of the right eye. (Exhibit 4I.)

70. The patient's drug levels were checked. A comprehensive blood count was taken, which was noted to be within normal limits, on December 16, 2004. The patient was noted to have a history of encephalomalacia on the right frontal lobe with a bony defect of the superior aspect of the right orbit. A treatment plan was assessed with respect to the patient's seizure control. He was given a low-bunk or low-gallery order. (Exhibit 4J.)

71. The patient was referred to the optometrist on December 21, 2004. (Exhibit 4K.)

72. Exhibit 4L documents the optometric examination by Dr. Anderson. (Exhibit 4L.)

73. On December 22, 2004, Mr. Smith complained of a headache and pain and was provided with ice to his eye. The patient reported he had fallen from his top bunk and suffered a contusion to his right eye (right periorbital area). (Exhibit 4M.)

74. The patient's complaints of pain and headache were related to the patient's fall. (Exhibit 4.)

75. Dr. Brown continued to see the patient in the quarterly seizure clinic. (Exhibits 4N (pp. 1-2), 4O (pp 1-2).)

76. Mr. Smith had other injuries relating to his seizures such as falling out of his bunk. Mr. Smith had fallen from his top bunk even though he had been given an order for a low bunk for his safety. Mr. Smith noted it was his decision to be on top, but was advised to remain on the low bunk. (Exhibits 4P, 4Q, 4R, and 4S.)

77. Dr. Brown personally saw the patient on November 28, 2005 regarding his seizure and fall. His note reads as follows:

> Now lucid following a seizure yesterday. He was on a top bunk because cellie claimed ownership of bottom bunk. Drug levels were drawn today. Plan: return to cell with low bunk order. (Exhibit 4.)

78. In Dr. Brown's opinion, the patient's significant medical issues during his stay at the Western Illinois Correctional Center dealt with maintaining control of the patient's seizures.

79. Subsequent to November of 2005, the patient was transferred to the Big Muddy River Correctional Center. Dr. Brown no longer saw this patient after his transfer date of December 28, 2005. (Exhibit 2.)

80. In Dr. Brown's opinion, the patient's drooping right eyelid did not constitute a serious medical need. (Exhibit 2.)

81. In coming to this conclusion, the patient's complaints regarding his drooping eye were evaluated by examination and review of the patient's CT scans and prior diagnostic tests. Discussions regarding the patient's condition took place with consulting physicians to determine whether or not treatment would be beneficial to the patient. It was determined that no treatment would provide function to the Plaintiff's right eyelid. (Exhibit 4.)

82. In Dr. Brown's medical judgment, appropriate care and treatment was provided to Mr. Smith regarding his complaints. (Exhibit 2.)

83. In reviewing the prior CT scan labeled Exhibits 3E and 3F, Dr. Brown agrees that the reference to the term "post-surgical" refers to a time after surgery and not suggest that any condition or symptom of the patient, John Smith, is correctable with surgery. (Exhibit 2.)

84. The lab reports for the comprehensive blood counts show normal white blood cell counts on all occasions. This indicates that Plaintiff had no infectious process taking place at the time the lab was taken. (Exhibit 2; Group Exhibit 4T, 19-page document reflecting lab results.)

85. Dr. Brown had no involvement in this patient's care prior to January of 2004, nor after December of 2005. (Exhibit 2.)

*Analysis*

Deliberate indifference to a serious injury or medical need violates a prisoner's rights under the Eighth Amendment to be free from cruel and unusual punishment. *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001), *citing Estelle v. Gamble*, 429 U.S. 153, 182-83 (1976).

The need must be objectively serious--"'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). Here, the plaintiff's medical needs are objectively serious–he has a seizure disorder and a drooping eyelid, which, although benign, does appear to affect his ability to see out of his eye.

However, there is no evidence of deliberate indifference to the plaintiff's medical conditions by any of the defendants, including Drs. Sims and Dr. Brown. To the contrary, the evidence shows that the plaintiff received continuous medication and regular visits to the seizure clinic for his seizure problem. The protrusion around his eye was also carefully evaluated, with the treating physicians ultimately determining the condition was benign by comparing the plaintiff's CT scans over time. The plaintiff's drooping eye was also carefully evaluated by medical professionals to determine whether the plaintiff would benefit from treatment. Those professionals ultimately determined that no treatment would restore function to the eyelid. The plaintiff offers no evidence to suggest that these determinations were negligent, much less a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate the person responsible did not base the decision on such a judgment." *Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996). The non-medical defendants were entitled to rely on these professional judgments. *Greeno v. Daley,* 414 F.3d 645, 656 (7th Cir. 2005).

Because there is no evidence of deliberate indifference, there is no inference of cruel and unusual punishment under the Eighth Amendment. With no underlying constitutional violation, the plaintiff has no federal case against any of the defendants. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998).

11

IT IS THEREFORE ORDERED:

1)  The motion for summary judgment by Defendant Drs. Sims and Brown is granted [d/e 32] on the grounds that there is no evidence of deliberate indifference to the plaintiff's serious medical needs during his incarceration at Western Illinois Correctional Center. The clerk of the court is directed to enter judgment in favor of all the defendants and against the plaintiff.

2)  All pending motions are denied as moot, and this case is terminated, with the parties to bear their own costs;

3)  If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(c). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Entered this 17th Day of January, 2007.

                                                **s\Harold A. Baker**

                                                HAROLD A. BAKER
                                    UNITED STATES DISTRICT JUDGE